IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| ROBYN CASIAS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO. _____ |
| v. | ) | |
| | ) | |
| AT&T SERVICES, INC., | ) | |
| | ) | |
| | ) | <u>JURY TRIAL DEMANDED</u> |
| Defendant. | ) | |

## COMPLAINT

COMES NOW Plaintiff Robyn Casias ("Plaintiff") and files this Complaint against AT&T Services, Inc. (hereinafter "Defendant AT&T") by and through her undersigned counsel, seeking recovery of damages and other appropriate relief for employment discrimination, respectfully showing the Court as follows:

## PRELIMINARY STATEMENT

1.

This is a civil action brought on behalf of Plaintiff Robyn Casias ("Plaintiff") against Defendant AT&T for gender discrimination and retaliation in violation of Title VII of the US Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., as well as together with any and all other causes of action which can be reasonably inferred from the facts as set forth below.

1

## THE PARTIES

2.

Plaintiff is a transgender woman and citizen of the United States. She resided in Cumming, Georgia at all relevant times. Plaintiff enjoyed an extremely successful career at Defendant AT&T for 16 years while presenting as a male named Robert Lott, a married man with three children. Robert Lott was a decorated and highly regarded "star" employee who was working as the lead architect on a major project at Defendant AT&T. Immediately after she appeared as Robyn Cassias and announced her transition at an in-person AT&T meeting, things changed drastically. Though Robert Lott was a star who led the most important projects, Robyn Cassias was an unwanted and unwelcomed outcast who was refused substantive work for three years and then terminated.

3.

Plaintiff was, at all times relevant herein, a Defendant AT&T's "employee" within the meaning of all relevant Federal, State and local laws, including, but not limited to, Title VII of the Civil Rights Act.

4.

Upon information and belief, at all times herein, Defendant AT&T was and is a national and international corporation registered to do business in Texas. Upon information and belief, Defendant AT&T conducts business in every state in the U.S.

5.

Defendant AT&T is and was, at all times relevant herein, Plaintiff's "employer" within the meaning of all relevant Federal, State and local laws, including, but not limited to, Title VII.

## JURISDICTION, VENUE, AND PROCEDURAL REQUIREMENTS

6.

This is a civil action for monetary damages and such other relief as the Court deems just and proper based upon Defendant AT&T's discrimination and retaliation against Plaintiff based on gender and gender identity, and Defendant AT&T's retaliation and wrongful termination of Plaintiff.

7.

This Court has Jurisdiction over this action under 42 U.S.C.A. § 2000(e) et. seq., and under 28 U.S.C.A. §§1331 and 1343(4).

8.

Venue for this action properly lies in this district pursuant to 28 U.S.C § 1391.

9.

All conditions precedent to filing the instant action have been fulfilled. On or about November 3 2020, Plaintiff filed a timely Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"). On or about September 29,

2023 the EEOC issued Plaintiff a Notice of Right to Sue. This action is being brought within 90 days of Plaintiff's receipt of her Notice of Right to Sue.

## DEMAND FOR JURY TRIAL

10.

Plaintiff hereby demands a jury trial of each count of the complaint.

## FACTUAL BACKGROUND

### Defendant AT&T Hires Plaintiff, who Then Presented as Male, as a Solutions Architect

11.

Between 1998 and 2001, Plaintiff helped launch one of the first United Stated cellular data internet services while working for Voicestream/T-Mobile, and launched one of the Nation's first Cellular Data Services over the Internet called Wireless Application Protocol ("WAP"). Due to Plaintiff's cutting-edge knowledge and demonstrated success, Plaintiff was heavily recruited by Defendant AT&T to come and work as a Senior Member of Technical Staff for them in Georgia. Defendant AT&T hired Plaintiff and paid for Plaintiff and Plaintiff's family to relocate from Tampa, Florida to Georgia.

12.

Plaintiff started working for Defendant AT&T in or about December 2001 as a Senior Member Technical Staff, and was promoted to Senior Solutions Architect in 2006, and to Senior Solution Architect in 2012.

13.

At that time, Plaintiff presented as male and went by the name Robert Lott. For work purposes she conformed to male gender norms. She outwardly appeared as a man, and as a man, enjoyed tremendous success at AT&T.

14.

Defendant AT&T is the largest provider of telecommunications services in the United States and the fourth largest in the world. Defendant AT&T is an international corporation with at least 8 subsidiaries including, among others, Cricket Wireless, WarnerMedia, and SBC Global Services.

**Plaintiff Has Great Success and is Celebrated as a
Standout Performer While Presenting as a Male at Defendant AT&T**

15.

In or about 2002, Plaintiff solutioned Defendant AT&T's first-to-market Cellular Data Services over the Internet called Wireless Application Protocol ("WAP"), a lucrative achievement for Defendant AT&T.

16.

In or about 2002, with subsidiary, Cingular, Plaintiff's work helped win a 100 million dollar AT&T revenue award on the launch of new WAP services with capabilities that later included Pay-Per-Use, another lucrative achievement for Defendant AT&T.

17.

On or about 2004, Plaintiff solutioned Defendant AT&T's first ability to charge per mobile messaging service for per-message event-based billing, yet another lucrative achievement for Defendant AT&T.

18.

In or about 2012, Plaintiff, solutioned Voice over LTE (VoLTE) solutions in the transition from 3G to LTE, yet another beneficial and valuable achievement for Defendant AT&T.

19.

In or about 2006, Plaintiff, under AT&T ATO Mobility Organization, filed a patent under AT&T for a data collection bus for all traffic types that can be used in analytics and the patent is currently protecting AT&T Solutions for profiling customers for targeted marketing content, an invaluable asset for Defendant Employer.

20.

In or about 2014-2019, Plaintiff solutioned Defendant AT&T's ATO Mobility Organization, 3G Micro Cell Activation and Registration solutions that included four patent submissions, valuable assets for Defendant AT&T, and upon information and belief insulated Defendant AT&T from litigation for patent violation because

Plaintiff held the Patent authorships that were at issue in the suit filed against Defendant AT&T.

21.

Plaintiff was invited to apply for a Principle Solution Architect in 2012 and for two years, from 2012-2014, Plaintiff was a critical member of the architecture team working tirelessly to build the infrastructure that launched a startup, AT&T-owned, prepay business called Aio Wireless. After Aio was operational, AT&T purchased Cricket Wireless and rebranded Aio to use the Cricket name. Plaintiff also provided the migration architecture to bring old Cricket customers onto the new Cricket infrastructure.

22.

In or about May 2014, Plaintiff was moved back to AT&T Technology Organization ("ATO"), where she was the Lead Principal Solution Architect developing solutions for the AT&T Dynamic Traffic Management (ADTM) program to enable high priority access into the network for public safety and first responders, including Enterprise Customers. Soon after the launch of the ADTM in or about March 2017, Defendant AT&T won a multi-billion-dollar contract with the USA Federal Government that leveraged the solutions Plaintiff's innovation was critical to develop.

23.

In Plaintiff's 2016-2017 appraisal, Plaintiff was commended for saving Defendant AT&T 10 million dollars by her architecture rework.

**Plaintiff Begins Living as a Transgender
Woman-Except at Work Due to her Fear of Discrimination**

24.

Beginning in or about 2014, Plaintiff began working from home and only went into the office as needed.

25.

On March 7, 2017, Plaintiff fully socially transitioned from he/him to she/her to her family, friends and the community in Cumming Georgia. Plaintiff went outside every day in her community as "Robyn," but continued to present as Robert at Defendant AT&T when she went into work out of fear of retaliation.

**Plaintiff is Awarded the Service Excellence
Award Due to Her Exceptional Performance,
While Still Presenting as a Male at Defendant AT&T**

26.

In or about, May 2017, Plaintiff, while still presenting as a man, was awarded Defendant AT&T's 2017 Service Excellence Award, a huge honor recognizing Plaintiff's contributions to AT&T Dynamic Traffic Management which was instrumental to the FirstNet multi-billion-dollar contract.

## **Plaintiff Travels to Dallas for a Weeklong In-Person Meeting**

27.

In or about June 2017, Plaintiff was asked to travel to Dallas, Texas for a series of Mobile Device Management projects where she was the Lead Architect. Plaintiff dreaded the thought of attending the Dallas meeting, spending an entire week as Robert.

28.

In or about June 2017, Plaintiff flew to Dallas to attend the meeting. For the first two days of the meeting, Plaintiff presented as a male and referred to herself as Robert.

## **Plaintiff Communicates her Gender Transition to Defendant AT&T**

29.

On or about the morning of the third day of the meeting, Plaintiff courageously decided to unveil her true self and communicate her gender transition to Defendant AT&T. That morning, Plaintiff put on her dress, makeup, and nail polish, and left her hotel room experiencing a whirlwind of emotions-- fear, irreversible decisions, the possibility of turning back, relief, regret, joy, newfound freedom, apprehension about discrimination, and a myriad of other intense feelings.

30.

When Plaintiff arrived at the meeting and sat down, there were two female coworkers already sitting at the table and engaged in a conversation. When they were done speaking with one another, they both turned to Plaintiff to introduce themselves, and stared at Plaintiff. Plaintiff politely smiled at the two women.

31.

After the women continued to stare and eventually recognized Plaintiff, they emoted shock and curiosity.

32.

In response, Plaintiff let them know that she had something to say, and briefly explained to them that she was Transgender and planned to further explain this to everyone in the room shortly once everyone arrived. Plaintiff requested that in the meantime, they go along with her and support her as the room filled up. Thereafter, Plaintiff went to the front of the room, introduced herself to the instructor from the past few days as Robyn, and requested a few minutes at the beginning of the meeting to explain her transition.

### A Coworker Expresses Outrage During
### Plaintiff's Gender Transition Announcement

33.

As coworkers arrived at the meeting and sat down at the table, Plaintiff could feel her coworkers' burning stares, as they realized who she was. Thereafter, when

a male coworker sat down at the table and recognized Plaintiff, his face turned beet red. Thereafter, he aggressively banged his fist on the table, abruptly stood up, and demanded, "what are you doing?" The coworker stormed to the front of the room in an attempt to calm himself down before he made his way back to the table.

34.

Thereafter, the instructor gathered everyone's attention and Plaintiff addressed her peers, introduced herself as Robyn, and announced that her pronouns were "she/her."

### Plaintiff Formally Announces her Transition to Defendant AT&T

35.

Upon returning back to work after the Dallas meeting , on or about August 17, 2017, Plaintiff made her formal reintroduction to the workplace as Robyn and announced her transition from he/him to she/her via email.

### Plaintiff is No Longer Assigned Projects After She
### Begins Presenting as a Woman at Defendant AT&T

36.

The long and successful career she had enjoyed at AT&T while presenting as male came to a screeching, unlawful halt thereafter.

37.

After serving as an outstanding and loyal AT&T employee for over a decade, and after receiving the undeniable accolade, Plaintiff finally felt secure enough in

the workplace to come out as transgender, concluding—wrongly—that because she was such an important part of the team and had achieved so much for AT&T.

38.

After her workplace transition, Plaintiff was taken off many of the previous projects she had been assigned prior to her transition. For example, at the Dallas, Texas meeting prior to her official transition at work, Plaintiff was assigned several Mobile Device Management projects under Manager, Adam Hurst ("Manager Hurst"). However, after announcing her transition and transitioning openly at Defendant AT&T, she was not thereafter assigned any new projects by Manager Hurst.

**Defendant AT&T Outrageously Decreases Plaintiff's
Project-Related Work After She Begins Presenting as a Woman**

39.

Prior to informing Defendant AT&T leadership of her gender transition, Plaintiff, working as Robert Lott, was allotted 95% project-related work and just 5% administrative work.

40.

Within three months after informing Defendant AT&T of her gender transition, her allotment of project work was reversed, and she was given just 20% project-related work and 80% administrative work.

41.

Ultimately, Defendant decreased Plaintiff's project-related work by 75% within three months of her coming out as a transgender woman in the workplace and after nearly 16 years of stellar employment.

42.

Plaintiff was provided no explanation for the near-elimination of project-related billables immediately following her coming out as a transgender woman at work. Her project ratio had never been impacted when she was male presenting.

43.

In or about February 2018, Plaintiff continued to report to Manager Hurst and saw her ATO Mobility Device Management solutions farmed out to other non-transgender comparator architects such as Architect Ryan Schaub and Architect Maryann Halstead.

**Plaintiff is Excluded from Critical Meetings**

44.

In addition to no longer receiving projects, after her official workplace transition, Plaintiff was excluded by her peers from critical meetings. For example, in or about May 2018, Plaintiff was suddenly informed prior to a scheduled meeting in Dallas, Texas that the meeting was cancelled. Plaintiff later learned from a colleague ("Colleague Doe") that the meeting went on without her. Upon

information and belief, the meeting was conducted without Plaintiff because AT&T did not want a transgender employee presenting.

### One of Plaintiff's Colleague's Files an EEO Charge on Her Behalf

45.

Given the glaring reduction in meaningful and appropriate work and exclusion from meetings on account of her transition to female and transgender status, in or about July 2018, Colleague Doe asked Plaintiff if they could anonymously report the blatant discrimination against Plaintiff to Defendant AT&T's Equal Employment Office (EEO).

### Plaintiff Reports Discrimination to Defendant AT&T Human Resources

46.

Plaintiff acquiesced and in or about August 2018, Defendant AT&T HR employee, Robin Owens ("HR Owens") requested to meet with Plaintiff and invited Debbie Lang-- AT&T's HR Transgender Representative ("HR Lang").

47.

During the meeting, Plaintiff reported the ongoing discrimination that had been occurring since her official transition at Defendant AT&T. Plaintiff reported that she was no longer being assigned projects by her current supervisor, Manager Hurst, and further reported that she was recently excluded from a meeting in Dallas, when she was falsely told that the meeting had suddenly been cancelled, yet went on

without her. Thereafter, when Plaintiff offered to follow up with a team member regarding the Dallas meeting being cancelled to show that the meeting had, in fact been conducted without her in an effort to exclude her, HR Lang abruptly cut Plaintiff off and aggressively raised her voice, and demanded "Don't do that."

48.

After the meeting, HR Owens followed up with Plaintiff that the "case was closed" and insisted that she could not disclose the findings of the investigation to her.

**Plaintiff is Continually Refused Work and
Subjected to Gender Discrimination at Defendant AT&T**

49.

In or about September 2018, Plaintiff was reassigned from Manager Hurst to Manager Casey Hanback ("Manager Hanback").

50.

Manager Hanback assigned Plaintiff to a few small projects with non-Architect team members where she provided solutions with a small audience. Thereafter, Manager Hanback and fellow team members presented and reviewed the solutions that Plaintiff came up with in a larger meeting without her.

51.

In or about the end of February 2019, the projects ended, and Manager Hanback failed to assign Plaintiff any further projects. For the next five months,

Plaintiff was left without work at Defendant AT&T and did not bill any hours for projects.

**Plaintiff Continually Reports Discrimination to Defendant AT&T HR**

52.

Throughout the remainder of Plaintiff's employment at Defendant AT&T, Plaintiff met with HR Lang on a monthly basis and worked with her on Transgender advocacy initiatives. Plaintiff continually reported that she was not receiving substantive assignments from her managers at Defendant AT&T to no avail.

53.

In or about July 2019, Plaintiff was told that she was once again, being re-assigned. This time, to Manager Ana Maroney's ("Manager Maroney") team.

54.

After joining her team, Manager Maroney asked Plaintiff why she had not been billing time for the last five months. Plaintiff responded honestly that AT&T had not assigned Plaintiff much billing work since she announced her transition in 2017 and was no longer given the same opportunities that she had before her transition—or any opportunities at all.

55.

Manager Moroney assured Plaintiff that she would ensure Plaintiff received billing work.

## **Plaintiff is Inexplicably Assigned Business Analyst Work**

56.

Thereafter, although Manager Moroney did get her billable work, Plaintiff was inexplicably assigned to a supporting role as a Business Analyst for the "AEGIS and Atlas" project under Director Andrew Apples ("Director Apples"). Upon information and belief, Director Apple had recently been promoted to a director role despite having less experience and less tenure at Defendant AT&T than Plaintiff. Over the course of her 18 years at Defendant AT&T, Plaintiff had never been assigned to a Business Analyst role, which was not in alignment with her expertise or technical architectural prowess.

## **Plaintiff is Once Again, Removed From Projects and Excluded from Calls and Meetings at Defendant AT&T Due to her Gender**

57.

In or about October 2019, Director Apples abruptly removed Plaintiff from the AGEIS and Atlas project. Upon information and belief, Plaintiff was removed from the project prior to an upcoming November 2019 Atlas face-to-face meeting because Defendant AT&T did not want a transgender employee present.

58.

Thereafter, Plaintiff was not assigned to any new projects and was continually excluded from team conference calls and group meetings.

59.

During this time, non-transgender coworkers Chris Pantano and Karthik Duraiswamy were promoted to Architect positions, despite the fact that they were far less qualified and experienced than Plaintiff.

60.

In December of 2019, Plaintiff met with Manager Moroney in-person and asked why she was suddenly removed from the project. Manager Moroney appeared visibly uncomfortable, and after a long pause, awkwardly responded, "it was an experiment that didn't work out," and brushed Plaintiff off by encouraging her to continue to engage with people at work regardless of not having any work assignments. Prior to her transition, Defendant AT&T had never "experimented with her role."

61.

In or about February 2020, Director Apples was the speaker for a Bring Your Own Coffee event that Plaintiff attended. At the event, Plaintiff asked Director Apples, "What does fostering inclusion in the workplace also Diversity and Inclusion meant to you?" Plaintiff effectively expressed her belief that she was taken off of the project due to her gender. In response to Plaintiff's question, Director Apples shrugged his shoulders, awkwardly looked down, and responded, "I might NOT have handled your situation the best way, but since learned from that

experience," publicly admitting that he did, in fact, remove Plaintiff from the project because of her gender.

## Plaintiff Continually Reports Gender Discrimination at Defendant AT&T

62.

In or about February 2020, Plaintiff had the opportunity to speak with Defendant AT&T's Assistant Vice President, Ken DiPrima ("AVP DiPrima") at a happy hour event. During their conversation, Plaintiff reported that after her transition in 2017, she was no longer given the opportunity at Defendant AT&T to engage fully in the workplace as an architect. In response, AVP DiPrima told Plaintiff that he would "try" to find meaningful work for her again at Defendant AT&T.

63.

In or about March 2020, Plaintiff confided to a friend and former colleague at Cricket Wireless, Assistant Vice President, Rick Allen ("AVP Allen"), that she no longer received substantive work at Defendant AT&T after her transition.

64.

AVP Allen expressed disappointment that Defendant AT&T, would engage in blatant discrimination and thereafter, encouraged Plaintiff to apply for a Principal Solution Architect position at Cricket Wireless—a subsidiary of Defendant AT&T,

given Plaintiff previously helped start Cricket and had extensive experience in Cricket technical environments.

65.

In or about April 2020, Plaintiff was placed on the "AGEIS project" as an Architect but was never really engaged. However, one month later, Plaintiff was told that the project was cancelled. Once again, leaving her without any substantive work. The AGEIS project was led by two other ATO architects between September 2017 to April 2020, and the project never launched under their leadership. Thereafter, Plaintiff was not assigned to anymore projects through the remainder of her employment at Defendant AT&T.

66.

After continually not receiving any substantive work at Defendant AT&T, in or about April 2020, Plaintiff decided to apply for the Principal Solution Architect position at Defendant AT&T subsidiary, Cricket Wireless.

67.

Seeking Manager Moroney's support, in or about April 2020, Plaintiff notified Manager Moroney that she recently applied for the position at Cricket Wireless.

68.

In or about May 2020, Manager Moroney brought up Plaintiff's recent application to Cricket Wireless and asked Plaintiff to identify who their hiring manager was. Plaintiff was immediately taken back by Manager Moroney's request and began to fear that she planned to sabotage Plaintiff's chances of getting the position in retaliation for her continued complaints of gender discrimination at Defendant AT&T.

**Plaintiff's Application at Defendant AT&T's Subsidiary is Denied**

69.

Sure enough, less than one month later, in or about June 2020, Plaintiff was informed by Defendant AT&T subsidiary, Cricket Wireless, that they were no longer considering her application for the Principal Solution Architect position.

**Plaintiff is Terminated from Defendant AT&T Due to her
Gender and in Retaliation for her Reports of Discrimination**

70.

Soon after, on or about July 10, 2020, Manager Moroney called Plaintiff and let her know that she was being terminated from her position at Defendant AT&T because Plaintiff was "on the surplus," and curtly informed her that her last day would be July 24, 2020.

71.

Plaintiff felt sick to her stomach and responded, "how do you expect me to find work outside of AT&T as a transgender woman?" In response, Manager Moroney coldly and insincerely apologized, reiterated that Plaintiff's last day would be July 24, 2020, and ended the call.

**Plaintiff Calls to Report her Wrongful Termination to Defendant AT&T HR**

72.

Shortly after, Plaintiff contacted Defendant AT&T's HR and filed a formal complaint, reporting that she had been unlawfully terminated from her position at Defendant AT&T and explicitly expressed that she believed her termination was due to her gender and in retaliation for her continued complaints of discrimination to Defendant AT&T. In response, the AT&T investigator contacted Plaintiff by telephone and assured her that Defendant AT&T "didn't find anything" to support Plaintiff's claim that being transgender was the reason for her surplus.

73.

Yet, when Defendant AT&T previously investigated her complaints of gender discrimination in 2018 and Plaintiff followed up, Defendant AT&T HR insisted that they were prohibited from telling Plaintiff anything about the outcome of the investigation.

## COUNT I
*(Gender Discrimination in Violation of Title VII*
*Against Defendant AT&T)*

74.

Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

75.

Defendant AT&T has discriminated against Plaintiff in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, et seq., as amended by the Civil Rights Act of 1991 ("Title VII"). Plaintiff has suffered disparate treatment as a result of Defendant AT&T's wrongful conduct.

76.

Defendant AT&T has discriminated against Plaintiff by treating her differently from and less preferably than similarly situated male, non-transgender employees, by subjecting her to harassment, a hostile work environment, disparate terms and conditions of employment, and other forms of discrimination on the basis of her gender in violation of Title VII.

77.

Defendant AT&T revealed its invidious motivation for this different treatment through numerous actions against Plaintiff.

78.

Defendant AT&T's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Plaintiff, entitling Plaintiff to punitive damages.

79.

As a result of Defendant AT&T's acts of discrimination, Plaintiff has suffered monetary damage, irreparable injury, mental anguish, pain and suffering, humiliation and ostracism, harm to her employability and earning capacity, painful embarrassment among her family, friends, and co-workers, damage to her personal and professional reputation, disruption of her personal life, the loss of enjoyment of the ordinary pleasures of everyday life, and other compensable damages.

80.

By reason of Defendant AT&T's discrimination, Plaintiff is entitled to all remedies available for violations of Title VII.

## **COUNT II**
*(Title VII Retaliation as to Defendant AT&T)*

81.

Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

82.

Plaintiff repeatedly complained and objected to Defendant AT&T's discriminatory treatment of her.

83.

In retaliation, Defendant AT&T subjected Plaintiff to a series of adverse employment actions including, but not limited to, harassment, threats, and unlawful, pretextual termination of Plaintiff's employment in violation of Title VII.

84.

Defendant AT&T's conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of Plaintiff.

85.

As a result of Defendant AT&T's conduct alleged in this Complaint, Plaintiff has suffered and continues to suffer harm, including but not limited to lost earnings, lost benefits, other financial loss, and non-economic damages.

86.

By reason of Defendant AT&T's retaliation, Plaintiff is entitled to all remedies available for violations of Title VII.

## COUNT III
*(Punitive Damages and Expenses of Litigation)*

87.

Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

88.

The actions of Defendant AT&T complained of herein evidence such willful misconduct, wantonness, malice, oppression, and an entire want of care which would raise a presumption of conscious indifference to the consequences thereof. Such conduct was committed reckless indifference to Plaintiff's federally protected rights so as to make appropriate the imposition of punitive damages on the Defendant.

89.

An award of reasonable attorneys' fees and costs expended by Plaintiff in the prosecution of this civil action is also appropriate in this civil action in accordance with Title VII and other applicable law.

## PRAYER FOR RELIEF

**WHEREFORE,** for the foregoing reasons, it is specifically requested that this Court grant Plaintiff judgment as follows:

26

A.    On Count I, awarding Plaintiff compensatory and other damages, including punitive damages in an amount to be determined at trial but in any case, no less than $1,000,000.00;

B.    On Count II, awarding Plaintiff compensatory and other damages, including punitive damages in an amount to be determined at trial but in any case, no less than $1,000,000.00;

C.    On Count III, awarding Plaintiff compensatory and other damages, including punitive damages in an amount to be determined at trial but in any case, no less than $1,000,000.00;

D.    Awarding Plaintiff, the costs and disbursements of this action, including reasonable attorneys' fees, together with such other and further relief as this court deems equitable, proper, and just.

Respectfully submitted this 22nd day of December, 2023.

**L F Barnes Law LLC**

*/s/ L'Erin Wiggins*
L'Erin Wiggins, Esq.
Georgia Bar No. 141797
P.O. Box 250464
Atlanta, Georgia 30325
Tel: (404) 680-6498
Fax: (404) 393-5763
Email: lerin@lfbarneslaw.com

**GODDARD LAW PLLC**

*/s/ Megan S. Goddard*

Megan S. Goddard, Esq.
[*Pro Hac Vice*]
39 Broadway, Suite 1540
New York, NY 10006
Telephone: (646) 964-1178
Facsimile: (212) 208-2914
Email: Megan@goddardlawnyc.com

*Attorneys for Plaintiff*
*Robyn Casias*